lml

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CHRISTIE HELM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 08-2459-JAR |
| | ) | |
| | ) | |
| STATE OF KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM AND ORDER

Plaintiff Christie Helm brings this action under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e, *et seq.*, against her former employer, the State of Kansas, alleging that she

was subjected to sexual harassment and that her employment was terminated in retaliation for

opposing the alleged harassment. This matter is before the Court on the plaintiff's Motion for

Partial Summary Judgment (Doc. 19) and defendant's Motion for Summary Judgment (Doc. 46).

For the reasons explained in detail below, the Court grants defendant's motion and denies

plaintiff's motion.

## I.       Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1]

In applying this standard, the court views the evidence and all reasonable inferences therefrom in

---

[1]Fed. R. Civ. P. 56(c).

the light most favorable to the nonmoving party.[2]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4]

Generally, the moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

In this case, although the issue of whether plaintiff is an "employee" under Title VII is an element of her case, whether she falls under the "personal staff" exception is an affirmative defense.[7]  Where a defendant is seeking summary judgment on the basis of an affirmative defense, the defendant has the initial burden of demonstrating that there is no disputed material fact regarding this defense and that the defense entitles him to judgment as a matter of law.[8]  When the defendant meets this initial burden, "the plaintiff must then demonstrate *with*

---

[2]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[3]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[4]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[5]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[6]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[7]*See Nichols v. Hurley*, 921 F.2d 1101, 1110 (10th Cir. 1990).

[8]*See Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir.1997).

*specificity* the existence of a disputed material fact."[9]  "If the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant is then entitled to summary judgment as a matter of law."[10]  "[C]onclusory and self-serving affidavits are not sufficient" to demonstrate the existence of a disputed material fact and thus defeat a motion for summary judgment.[11]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[12]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[13]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[14]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[15]  Rule 56(e) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[16]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by

---

[9]*Id.* (emphasis added).

[10]*Id.*

[11]*Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991).

[12]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[13]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[14]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[15]*Adams*, 233 F.3d at 1246.

[16]Fed. R. Civ. P. 56(e).

specific facts, or speculation.[17]  "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[18]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[19]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[20]

## II.     Uncontroverted Facts

Consistent with the well-established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to the nonmoving party.

Plaintiff Christie Helm was first hired by the State of Kansas in 1995 for the position of Records Clerk I.  The position was in the district court clerk's office for the First Judicial District in Leavenworth, Kansas.  Helm later moved to the position of Trial Court Clerk I within the

---

[17]*Id*.; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[18]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[19]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[20]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

same office.  In 1997, Helm move to the position of Trial Court Clerk II, and then in 1998, Trial Court Clerk III within the same office.  As part of that position, Helm supervised limited claims, small claims, civil, and reception duties, and was directly responsible for maintaining the criminal docket.

The Honorable David King has ben a district judge in the First Judicial District ("the District") since 1986.  Judge King became administrative, or chief, judge of the District in 1990 or 1991.

The Honorable Frederick Stewart was elected to the position of associate district judge in the District in 1977.  Following Judge Stewart's election, there was a statewide reorganization of the judicial branch and the position of associate district judge was eliminated.  Judge Stewart, along with other associate district judges, became a district judge.  The method of selecting judicial judges in the District also changed from appointment to election.  Judge Stewart, by virtue of his elected position, continued as a district judge, but faced a retention election every four years as did other appointed judges.

In 1998, Judge Stewart had a court reporter.  That year, two new judges were appointed in the District: the Honorable Robert J. Bednar and the Honorable Gunnar A. Sundby.  Anita Scarborough was hired as Judge Sundby's administrative assistant, and Darla Farnsworth replaced Scarborough as clerk of the district court.  Amanda Lowe was hired as Judge Bednar's court reporter in November 1998.

Steve Crossland became the court administrator for the District in March 2005.  His duties include supervision of the district court clerk's office and the court services office, preparation of the annual budget, and keeping records, time sheets and employee evaluations.

The court administrator has no supervisory authority over administrative assistants to district judges.

Crossland replaced Ron Chance as the court administrator when Chance retired in February 2005. Judge King testified in his deposition that while he was chief judge, Chance was charged with driving under the influence of alcohol and went into a diversion program. Chance was not terminated as a result of the diversion. There is no evidence in the record regarding the circumstances or specifics of Chance's diversion agreement.

In September 1998, Helm was hired to fill an administrative assistant position assigned to the newly-created district judge position for Division 6 in the District, to which Judge Bednar had been appointed. This administrative assistant position was shared between Judges Bednar and Stewart. Both judges participated in the interview of Helm and in the decision to hire her as an administrative assistant. Judge Bednar testified that Judge Stewart recommended that Helm be selected for the position of administrative assistant, and he acceded to Judge Stewart's recommendation and selected Helm for the position. Although Judge King was chief judge when Helm was appointed as administrative assistant, he attests that he did not appoint her to that position, and that Judge Bednar was her appointing authority. Judge King further attests that he did not assign work to Helm, did not supervise her work, and had no input as to her performance evaluations. Judge Stewart was never Helm's appointing authority.

The position description signed by Helm when she was hired as an administrative assistant states the purpose of the position as: "Responsible and complex secretarial and administrative work under the direct supervision of a District Judge." The position describes the duties to include the following:

- In-court related duties including but not limited to operating cassette tape recorder and maintaining tapes and control sheets, and logging judge's notes in court files and/or computer.
- Preparing information and answering questions; maintaining calendar and docket control for District Judge; serving as private secretary to District Judges; compiling data and composing and typing routine letters, notices and other materials.
- Prepares transcripts from recording machines and performs other duties and completes other documents related to transcript preparation.
- Dockets; monitors daily court docket for judges to which assigned; compiles statistical data and prepares appropriate reports.

Helm also assisted The Honorable Patrick Reardon, a retired judge who worked

*pro tem* handling the domestic violence and protection from abuse docket one day per week.

Judge Bednar attests that Judge King played no role in the supervision or assignment of duties to

Helm, but rather, Judge Bednar assigned Helm to perform duties as directed by himself, Judge

Stewart and Judge Reardon. Helm testified that she maintained the judges' calendars, including

their personal calendars; she was the "direct contact for all of the attorneys when they were

coming to court or calling"; she received the judges' mail; she responded to letters and other

contacts from inmates; and she proofread transcripts for two of the court reporters. Helm stated

that she attended court proceedings and entered the judges' notes into the computer. She

described additional duties as follows:

> I was responsible for all of the judges['] notes, their personal
> documents and information, confidential material and evidence for
> court cases. I scheduled all of their daily dockets, and meetings or
> social engagements. I also helped to keep track of their
> Continuing Judicial Education and Bar Association fund raisers or
> other functions. All three judges performed wedding ceremonies

and I often stayed as a witness.

Helm testified that she scheduled hearings, handled emergency ex parte orders, prepared appointments of legal counsel for the indigent in felony and misdemeanor cases, as well as restraining orders, arrest warrants, memos, scheduling orders and decisions.  She stated that she "performed all other duties as assigned by each judge."

As an administrative assistant to a district judge, Helm was a "confidential employee" of the District.  Under defendant's policy manual, "confidential employees serve at the will of their respective appointing authorities."  During the years Helm worked as an administrative assistant, either Judge Stewart or Judge Bednar signed her performance evaluations as the person rating Helm's performance, and either Judge Stewart or Judge Bednar signed her time sheets. Although Judge King's signature appears on Helm's evaluations as "Appointing Authority," Patricia Henshall, Director of Personnel for the Kansas Judicial Branch, explains in her affidavit that the fact that a chief judge signs a performance appraisal for the administrative assistant to a judge other than himself does not render the chief judge the appointing authority and that Judge King's signature on the evaluations was superfluous and has no bearing on  the identity of Helm's appointing authority.

Helm slipped and fell in the parking lot at work in December 2003.  She broke her tailbone in the fall, and received various types of treatment during 2004 and 2005, including pain medications, injections and surgeries.  Helm was also taking prescribed anti-depressant medications during that time period.  In March 2006, Helm requested six months of medical leave due to problems with low back pain.  Helm was granted unpaid leave under the Family Medical Leave Act ("FMLA") because she had exhausted her paid sick leave and vacation.

Judge Stewart signed the form approving Helm's request for six months leave under the FMLA. Helm applied for and received paid leave under the Kansas Judicial Branch's shared leave program, which Judge Stewart also approved. Helm was on medical leave from March through August 2006.

The District has adopted a policy against sexual harassment and discrimination promulgated by the Kansas Judicial Branch as stated in the Kansas Court Personnel Rules. According to those rules, the court administrator has a duty to receive complaints about harassment from employees, whether the complaint is written or oral. The court administrator must then relay the complaint to the Office of Judicial Administration ("OJA") in Topeka. When the complaint involves allegations against a judge, the Kansas Court Personnel Rules dictate that the matter is reported to OJA, and OJA coordinates with the Commission on Judicial Qualifications to conduct an investigation.

All court employees receive a copy of the Kansas Judicial Branch Employee Handbook and are required to sign an acknowledgment page indicating that they have received a copy of the handbook and have read the policies and understand them. Helm admits that she received a copy of the handbook, read through it, and signed the acknowledgment page. She kept a copy of the handbook in her desk drawer at work.

The handbook includes a section on sexual harassment and a statement of anti-harassment policies. The sexual harassment policy states in part:

> An employee who believes he or she has been subjected to unlawful harassment should bring the concern to the immediate supervisor, appointing authority, or the Director of Personnel. Employees will not be retaliated against for making a sexual harassment complaint. All complaints are taken seriously and a

confidential investigation will be conducted promptly.

Helm testified that she never read the sexual harassment policy.

Helm did not receive training concerning sexual harassment and testified that she was unaware of any sexual harassment policy. Non-management employees of the court did not receive any training on sexual harassment. Steve Crossland testified that he received training and some of the other court services employees may have received training during annual conferences. Darla Farnsworth testified that she received training and provided training to her employees in the Clerk's office.

The Kansas Court Personnel Rules devote a chapter to stating a policy prohibiting sexual and other workplace harassment and a procedure for making a complaint and investigation of the complaint.

Helm testified that Judge Stewart began a course of inappropriate behavior toward her in 1998, which escalated in 2007. Helm testified that when she returned from surgery in 2006, Judge Stewart began touching her inappropriately, including kissing her, putting his hand up her skirt, fondling her breasts, and unbuttoning her blouse and putting his mouth on her breasts. Helm reported to co-workers that Judge Stewart made her feel uncomfortable. Larry Thibault, Judge Stewart's long-time court reporter, testified in his deposition that he had heard "rumors" about Helm and Judge Stewart and overheard Helm tell a co-worker that Judge Stewart had touched her buttocks when they were going up the stairs. Thibault further testified that he did not understand the anti-harassment policy as requiring him to report what he overheard Helm tell another co-worker.

In late June or early July 2007, Helm approached Judge King and told him that Judge Stewart had done something inappropriate and "made her feel uncomfortable."  Judge King testified that he told Helm that "no one should work under those circumstances," and that if she wished to make a complaint, "we would stand beside and support her fully and that there would be no consequences to her as a result."  Helm testified that Judge King told her that a complaint takes on a "life of its own," which she took as implying it would be out of her control.  Helm said that she wanted to think about whether to make a complaint, and King testified he replied, "Well, don't take too long, because if you don't do anything, I'm going to have to do something since you've conveyed this to me."  She came back to Judge King the same day and said she had talked to Judge Stewart herself and that "everything was worked out and she didn't wish to pursue it."  Judge King did not make a report to Crossland or the OJA following this conversation with Helm.

In July 2007, Helm requested medical leave in order to receive inpatient treatment for substance abuse.  She was granted unpaid leave under the FMLA after she exhausted her paid sick leave and vacation.  Judge Stewart signed the form approving Helm's request for leave. During July 2007, Helm received inpatient treatment at Valley Hope, an alcohol and drug rehabilitation center.

On August 8, 2007, Helm reported to Judge Bednar that she was being "sexually harassed" by Judge Stewart.  This was the first time Helm had said anything about the alleged harassment to Judge Bednar.  Helm told Judge Bednar that she was raising the issue with him because she was returning to work after taking a leave of absence and did not want to continue to work for Judge Stewart.  Judge Bednar testified that Helm told him the harassment was

"basically verbal," but had progressed to touching, and that she had reported the incidents to Judge King in June, but had talked to Judge Stewart and thought they had resolved the matter.

Judge Bednar reported the conversation to Judge King that same day. Judge King confirmed that Helm had come to him earlier, but asked him not to take action against Judge Stewart. Judge King advised Judge Bednar to report the conversation to Crossland, which he did. Judge Bednar also informed Judge Stewart of the conversation and that he had reported the conversation to Judge King and Crossland.

Helm did not return to work as planned on August 13, 2007. Helm and her husband, Mike, met with Crossland on August 21, 2007. Helm was concerned because she had received smaller paychecks and then no checks at all during her extended leave of absence. Crossland explained that this was so because Helm had exhausted her paid leave in mid-July. Crossland suggested that Helm could apply for shared leave, which she did. Crossland testified that he assured Helm that she still had a job and could come back to work, and that Helm did not indicate when she thought she would come back to work. Crossland raised the issue of Helm's complaint against Judge Stewart and told Helm that harassment would not be tolerated and the matter was under investigation regardless of whether she chose to file a formal complaint. Crossland testified that he assured Helm that he would assist her in any way possible when she returned to work, and they could discuss altering her duties when she came back. Helm testified that she does not remember Crossland telling her anything in that conversation except about the investigation and FLMA leave and asking her if the allegations were true.

Helm's complaint against Judge Stewart was investigated by the Commission on Judicial Qualifications, but was not completed because Stewart retired from the bench and moved out of

state.  In Helm's statement to the Judicial Qualifications Committee in September 2007, she stated that she waited to report the harassment because she was intimidated by Judge Stewart because she worked at the "total discretion" of the judges and that she was hoping he would just retire, and the harassment would stop.

Subsequently, Helm was arrested on September 18, 2007, following an altercation with her husband.  Although Helm's husband asked that the charges be dropped, she was charged with aggravated battery, a felony, and domestic battery and disorderly conduct, both misdemeanors.  A judge outside the District was assigned to handle Helm's criminal proceedings.  On November 23, 2007, Helm entered into a diversion agreement that stipulated to the facts and stated she believed there was enough evidence to support the charges against her.

In a letter to Helm dated December 3, 2007, Judge King indicated that Helm's conduct in connection with her arrest violated various provisions of the Kansas Court Personnel Rules. Judge King also indicated that Helm's decision to enter into a diversion for a felony prohibits her access to defendants' criminal history information under rules promulgated for the Kansas Criminal Justice Information System ("KCJIS").  Judge King stated that without the ability to access KCJIS information, Helm could not carry out her duties as a judicial administrative assistant.  For these reasons, Judge King stated that he proposed to terminate Helm's employment.  He offered Helm the opportunity to respond in writing, which she did on December 7, 2007, asking that she be allowed to continue her employment.  Helm responded that she felt termination would be retaliatory, since Judge Stewart was allowed to continue working even though there were allegations against him and that another court employee, Ron Chance, was allowed to keep his position even though he was in a diversion program for driving

under the influence.

In a letter dated December 14, 2007, Judge King stated that Helm was terminated effective that day. Judge King said, "Simply put, the decision to propose termination of your employment was based exclusively upon your admitted criminal misconduct and nothing else. Absent such misconduct, termination of your employment would not have been proposed."

Steve Crossland testified that but for Helm's arrest and diversion, she could have returned to her duties as an administrative assistant with a different judge or in a different office.

Helm filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 22, 2008, alleging she was the victim of sexual harassment and retaliatory discharge prohibited by Title VII. In her complaint, Helm stated that she worked at the discretion of Judge Frederick Stewart. On June 27, 2008, the EEOC issued an order dismissing the complaint with the comment, "No jurisdiction, no employer-employee relationship." This lawsuit followed on September 24, 2008.

## III.  Analysis

### A.  Helm's Status as an "Employee"

In order to bring any action pursuant to Title VII, plaintiff must show that she was an "employee." The Tenth Circuit has held that Title VII's "employee" requirement is an element of plaintiff's claim for relief rather than a matter of subject matter jurisdiction.[21] Title VII defines "employee" as "an individual employed by an employer."[22] There are four express exemptions

---

[21]*Xie v. Univ. of Utah*, 243 F. App'x 367, 371 (10th Cir. 2007) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 512 (2006)) (holding that Title VII's "employer" requirement is an element of plaintiff's claim for relief).

[22]42 U.S.C. § 2000e(f).

to this definition:

> The term "employee" . . . shall not include [1] any person elected
> to public office in any State or political subdivision of any State by
> the qualified voters thereof, or [2] any person chosen by such
> officer to be on such officer's personal staff, or [3] an appointee on
> the policy making level or [4] an immediate adviser with respect to
> the exercise of the constitutional or legal powers of the office. The
> exemption set forth in the previous sentence shall not include
> employees subject to the civil service laws of a State government,
> governmental agency or political subdivision.[23]

Individuals who fall within these exemptions are not without recourse, however, as the

Government Employee Rights Act of 1999 ("GERA"),[24] confers Title VII rights on those

individuals covered by exemptions 2, 3 and 4, but not the elected official himself.[25] Such

individuals must file a discrimination claim with the EEOC, and if the EEOC determines that a

violation has occurred, it may provide appropriate relief.[26] Unlike Title VII proceedings, which

provide for *de novo* review of EEOC actions in federal district court, an individual proceeding

under GERA must seek judicial review in the federal circuit courts.[27] Helm admits that she made

no claims under GERA, and if she had, this Court has no jurisdiction over the claims. Helm does

not dispute that her sexual harassment claim was untimely filed with the EEOC under GERA,

and proceeds solely on the theory that her claims are properly raised under Title VII.

Defendant contends that Helm does not meet the definition of an employee under Title

---

[23]*Id.*

[24]42 U.S.C. § 2000e-16a-17.

[25]*Id.* § 2000e-16c(a).

[26]*Id.* § 200e-16c(b)(1).

[27]*Id.* § 2000e-16c(c).

VII because, as an administrative assistant to a state district judge, she was "personal staff" to an elected official. Although a plaintiff's status as an employee under Title VII is a question of federal, rather than of state, law, "[s]tate law is relevant insofar as it describes the plaintiff's position, including [her] duties and the way [she] is hired, supervised and fired.[28] Under the Kansas Civil Service Act ("KCSA"),[29] all employees of the courts are considered members of the state's unclassified service.[30] The Kansas Supreme Court has adopted the Kansas Court Personnel Rules ("KCPR").[31] As an administrative assistant to a district judge, Helm was a "confidential" employee under the KCPR, defined as follows:

> Confidential Employee. An employee who serves at the will of the employer.
> The employment of confidential employees may be terminated at any time. They
> have no right to appeal performance evaluations, discipline or termination.
> Accord KCPR 5.3(e).

Under KCPR 5.3(e), "Confidential employees of district court judges include district court trustees, hearing officers, research staff employees, and administrative assistants and secretaries who serve individual judges." Under KCPR 1.4(f), confidential employees are personally accountable to their respective appointing authorities; under KCPR 5.2(g), the appointing authority of a confidential employee is the judge. Confidential employees are not subject to the civil service system of the Kansas Judicial Branch.[32]

---

[28]*E.E.O.C. v. Reno*, 758 F.2d 581, 584 (11th Cir. 1985) (citations omitted).

[29]K.S.A. 75-2925, *et seq.*

[30]K.S.A. 75-2935(1)(k).

[31]*See* K.S.A. 20-162 (requiring Kansas Supreme Court to establish judicial personnel classification system).

[32]KCPR 12.1(b); 1.4(f); 5.3(e).

The Tenth Circuit has held that the following non-exhaustive list of factors should be considered in determining if the personal staff exception applies:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.[33]

The Tenth Circuit noted that policy making or advising are not pertinent factors to the personal staff exception nor is the inability "to hire people, buy equipment or direct the placement of manpower. . . ."[34]

The Tenth Circuit has also articulated a burden-shifting standard on motions for summary judgment invoking the personal staff factors:

> In *Teneyuca*, when the defendant's evidence on the first three or four factors indicated that the personal staff exception should apply, the court held that such a showing was sufficient to shift the burden to the plaintiff to demonstrate that a material issue of fact existed as to the true nature of her relationship with the elected official in question, *i.e.*, that it was in fact other than that implied by defendant's evidence. 767 F.2d at 152. When the plaintiff failed to make a sufficient showing of an issue of material fact, the court ruled that summary judgment for the defendant was appropriate.[35]

---

[33]*Nichols v. Hurley*, 921 F.2d 1101, 1110 (10th Cir. 1990) (applying the factors to definition of "employee" under Fair Labor Standards Act) (adopting factors set forth in *Teneyuca v. Bexar County*, 767 F.2d 148 (5th Cir. 1985)).

[34]*Id*. at 1111, 1114.

[35]*Id*. at 1111.

In this case, however, both parties have moved for summary judgment on the issue of whether Helm is an employee.

The Tenth Circuit has held that "personal staff" includes those in positions such as an undersheriff and sheriff's deputies.[36]  In *Owens v. Rush*,[37] the court observed that Congress wanted the exception "to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official."[38]  Applying this test, an undersheriff who was second in authority to the sheriff, was found to be a member of the sheriff's personal staff.[39]  The undersheriff admitted he had "a very close working relationship with the sheriff."[40]  The "nature and circumstances" of the employment relationship determined that the personal staff exemption applied.[41]  The question of whether a district court judge's administrative assistant falls within the "personal staff" exemption, however, is one of first impression in this Circuit.

In *Bland v. New York*,[42] the Eastern District of New York addressed whether a judge's secretary met the "personal staff" exemption in Title VII.  In that case, plaintiff was a secretary

---

[36]*Nichols*, 921 F. 2d at 1113-14 (FSLA context); *Owens v. Rush*, 654 F.2d 1370, 1374-75 (10th Cir. 1981) (Title VII context); *see also Mulvaney v. N.M. Atty. Gen. Office*, No. 98-1137 JC/LFG, 2000 WL 35542724, at *6 (D. N.M. 2000) (director of the prosecution division in the attorney general's office held to be "personal staff" of attorney general).

[37]654 F.2d 1370 (10th Cir. 1981).

[38]*Id*. at 1375.

[39]*Id*. 1376.

[40]*Id*.

[41]*Id*.

[42]263 F. Supp. 2d 526 (E.D.N.Y. 2003).

to a Justice of the New York Supreme Court.[43]  As a court employee, plaintiff was exempt from state civil service laws, and as a secretary to a judge, was exempt from court rules adopted by the state's high court.[44]  The judge hired plaintiff, had authority to fire her, completed her performance evaluations and signed her time sheets.[45]  Plaintiff answered the phone for the judge, typed documents for him, and worked with him in chambers.[46]  Applying the six-factor test adopted by the Tenth Circuit in *Nichols*, the court concluded that plaintiff clearly fit the definition of "personal staff" as a matter of law, defeating her Title VII claims.[47]

Helm does not dispute the status of Judge Bednar and Judge Stewart as "elected officials" for purposes of the personal staff exemption, but instead, argues that, unlike the plaintiff in *Bland*, she does not meet the personal staff exemption because she worked for more than one judge.  More specifically, Helm contends that the exemption and six-factor analysis requires *one* elected official who chose plaintiff to be on his personal staff.  Nevertheless, as a threshold matter, the Court addresses whether Judge Bednar and Judge Stewart were "elected officials" for purposes of Title VII.

 Kan. Const. Art. 3, § 6, relating to district courts, establishes the office of district judge. That section states that a district judge "shall be elected by the electors of the respective judicial

---

[43]*Id*. at 531.

[44]*Id*. at 537.

[45]*Id*.

[46]*Id*.

[47]*Id*. at 544-45.

districts," unless a respective district has adopted a method of nonpartisan selection.[48]  Judges

appointed under the nonpartisan selection method do not run for office in the general election,

but must nonetheless be submitted and resubmitted "to the electors of a judicial district" for a

retention election every four years."[49]  There is no difference between an elected or appointed

district judge in terms of duties, pay or powers of office.

The Tenth Circuit has not specifically addressed whether judges appointed and retained

under a nonpartisan selection system are considered "elected officials" for purposes of Title VII

or other federal statutes.  The Supreme Court has determined, however, that appointed state court

judges are appointees at the policy-making level and therefore not "employees" protected by the

Age Discrimination in Employment Act ("ADEA") against state mandatory retirement

requirements.[50]  Finding that the ADEA did not plainly protect appointed state judges, because it

was at least ambiguous whether state judges fit the exception for appointees on the policymaking

level, the Court concluded that state judges were not protected under the ADEA.[51]  In so ruling,

the Court declined to address the state's alternative argument that the appointed judges were

"elected to public office" because they are subject to retention after election.[52]  Although Judge

Stewart was elected to the bench in 1976, when the method of selection of district judges

changed to nonpartisan selection, he was required to stand for retention election.  By contrast,

---

[48]Kan. Const. Art. 3, § 6.

[49]*Id*; *see also* K.S.A. 20-2901, *et seq.* (nonpartisan selection of judges to the district court).

[50]*Gregory v. Ashcroft*, 501 U.S. 452, 464-67 (1991).  Although *Gregory* arose under the ADEA, there is no reason to doubt that it would not apply to Title VII cases as well, since the ADEA adopts the same definition of employee found in Title VII.  *Compare* 29 U.S.C. § 630(f) *with* 42 U.S.C. § 2000e(f).

[51]*Id*. at 467.

[52]*Id*.

Judge Bednar was initially selected for his position, and subsequently stood for retention. Neither party addresses the *Gregory* decision or its application to this case. Thus, the Court will analyze the personal staff exemption factors considering both judges as the "elected official."

### *Plenary Powers of Appointment/Removal*

Helm argues that neither Judge Bednar nor Judge Stewart had plenary power to appoint or remove her. Although she admits that she was a confidential employee, she argues that she was not a confidential employee of any particular judge, but rather, the District, serving at the pleasure of Judge King, whom she contends was her appointing authority. While the record is somewhat unclear on this point, Helm does not dispute that Judge Bednar or Judge Stewart had the same power to appoint and remove her as Judge King. Instead, she argues that plenary power means that the decision was exclusively made by only one person. "Plenary" is defined as full, complete or entire.[53] That more than one judge had such plenary authority does not change the nature of that authority.

Even if Judge Stewart, the alleged harasser, did not have the exclusive authority to hire and fire his administrative assistant, the Court notes that the nature and circumstances of the relationship between Judge Stewart and Helm overwhelmingly weighs in favor of excluding her from the Title VII definition of employee, as discussed further, below. While Helm is correct that the cases analyzing this issue involve one elected official, the fact that Judge Bednar and Judge Stewart hired her on a joint basis and shared the administrative assistant position, the issue should be of less importance in a case like this.

_____

[53]Black's Law Dictionary (8th ed. 2004).

### Personally Accountable

Similarly, Helm argues that although she was personally accountable to both Judge Bednar and Judge Stewart, the personal staff exemption requires personal accountability to only one person. While Helm was accountable to both judges, the record is clear that she performed work and was answerable only to Judge Bednar and Judge Stewart, not to the court or the District as a whole. Unlike her previous positions, Helm did not work in the clerk's office, nor was she in a secretarial "pool." It is undisputed that there were no intermediary supervisors between the judges and Helm.

In *Laurie v. Alabama Court of Criminal Appeals*,[54] the court analyzed whether staff attorneys who worked for appellate judges met the personal staff exemption. Although ultimately finding that pursuant to the Court of Appeals' implemented policy statements, the individual judges appointed and removed staff attorneys, rather than shared the staff attorneys, the court also found that the staff attorneys did not work for the court as a whole, and the level of personal accountability to the judge for whom they work "is consistent with the highly sensitive and confidential nature of the work which staff attorneys perform."[55] The court focused on the sixth factor as most important, finding that the staff attorneys and their appointing judges have "a close and intimate relationship."[56] Thus, as with the plenary authority factor, the Court finds the fact that Helm was personally accountable to both Judge Bednar and Judge Stewart is of less importance given the nature of their relationship.

---

[54] 88 F. Supp. 2d 1334 (M.D. Ala. 2000).

[55] *Id*. at 1348.

[56] *Id*.

*Public Representation*

Helm argues that she did not represent either Judge Bednar nor Judge Stewart in the eyes of the public because she was not considered by anyone to be a "stand-in" for any of her supervisors, unlike the undersheriff in *Owens*[57] or the staff attorneys in *Laurie*.[58]  The Court disagrees.  By Helm's own admission, she answered the phones, attended chambers, scheduled hearings and meetings and attended court proceedings for both judges.  Helm testified that she was the "direct contact for all of the attorneys when they were coming to court or calling." Clearly, Helm was the point of contact for attorneys and other members of the public who sought to communicate with both judges, and thus she represented Judge Bednar and Judge Stewart in the eyes of the public.[59]

---

[57]In *Owens*, the court found that the undersheriff was second in authority under the sheriff and acted on his behalf when he was not available or present. 654 F.2d at 1376.

[58]In *Laurie*, the court found that on occasion, staff attorneys would visit law schools and conduct interviews for law clerks on behalf of the judge she worked for.  88 F. Supp. 2d at 1348.

[59]*See Bland v. New York*, 263 F. Supp. 2d 526, 540 (E.D.N.Y. 2003).

### Control Over Position

Helm concedes in her response that Judge Bednar and Judge Stewart exercised control over her position, and that "it is clear that plaintiff's day-to-day activities were intended to be—and were in fact—assigned, supervised, and rated by Judge Stewart and Judge Bednar."[60] Judge Stewart and Judge Bednar signed her time sheets, her performance evaluations, and her requests for paid and unpaid leave. Helm's argument that Judge King was the only individual with authority to dictate the duties of her position and terminate her from the position is not supported by the record. Helm also argues that neither Judge Bednar nor Judge Stewart exercised more control over her position than the other. Again, given the circumstances of her working relationship with both judges, the Court finds this makes less difference to the analysis.

### Level of Position Within Chain of Command

Helm characterizes her position as administrative assistant as a "clerical position" in the District "which provided clerical services to multiple district judges."[61] As such, Helm argues, she was a "confidential employee" of the District, but not a confidential employee of a particular judge. The record does not support Helm's argument. Helm answered only to her judges, with no intermediary position between them. The organizational chart for the District shows the administrative assistants are just below the district judges in the chain of command.

### Actual Intimacy

The actual intimacy of the working relationship between the official and the person

---

[60](Doc. 55 at 29.)

[61](Doc. 55 at 31.)

filling the position is consistently characterized by courts as the most important factor.[62]  Helm

does not dispute defendant's description of the intimacy of her working relationship with Judge

Stewart and Judge Bednar, which is significant.  By Helm's own admission, she maintained the

judges' calendars, including their personal calendars; she was the direct contact for all attorneys

who called or stopped by to see the judges; she received the judges' mail; she responded to

letters and other contacts to the judges; she attended court proceedings and entered the judges'

notes into the computer; she was responsible for the judges' personal documents and

information, confidential material and evidence for court cases; she scheduled all of their daily

dockets, meetings and social engagements; she helped keep track of their continuing judicial

education and bar association functions; and she scheduled hearings, handled emergency ex

parte orders, prepared appointments of legal counsel for indigent defendants; prepared

restraining orders, arrest warrants, memoranda, scheduling orders and decisions.

Helm argues that because she worked for both Judge Bednar and Judge Stewart, the

actual intimacy of her working relationship with either lacked the "high level of personal

accountability" required for this factor.  The Court disagrees and finds it hard to envision an

employment relationship that is more close and personal than the relationship between a judge

and his or her administrative assistant, with the possible exception of a judge's law clerk.  As an

administrative assistant, Helm was privy to her judges' confidential communications and

deliberations.  The Court reiterates that regardless of who did the hiring and firing, and whether

Helm's administrative position was shared between two judges, the nature and circumstances of

the relationship between those judges and Helm heavily favors excluding Helm from the

---

[62]*See Laurie*, 88 F. Supp. 2d at 1338.

definition of employee because she was a member of Judge Bednar and Judge Stewart's "personal staff."

Based on its analysis of these factors, the Court concludes that Helm is exempt from the definition of "employee" under Title VII. Accordingly, the Court denies Helm's motion for partial summary judgment, and grants defendant's motion for summary judgment as a matter of law on this issue.[63]

## B.      Merits of Title VII Claims

Even assuming Helm was an employee for Title VII purposes, her claims for harassment and retaliation are without merit. The Court addresses each claim in turn.

### 1.      Sexual Harassment

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex."[64] In order to make a claim of sex discrimination based on a hostile work environment, such as Helm has made in this case, "a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment."[65] Because defendant does not

---

[63]Because the Court grants summary judgment on the issue of whether plaintiff was an employee, it does not reach the issue of whether plaintiff's Title VII claim is barred by collateral estoppel. The Court notes, however, that this issue appears to be an attempt by defendant to recast its argument that plaintiff should have brought her claim under GERA instead of Title VII.

[64]42 U.S.C. § 2000e-2(a)(1).

[65]*Pinkerton v. Colo. Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)).

dispute for summary judgment purposes that Judge Stewart's actions and comments created a hostile work environment, the only question before the Court is whether defendant is either vicariously or directly liable for that environment.

An employer may be vicariously liable to a victimized employee for an actionable hostile work environment created by a supervisor with immediate or successively higher authority over the employee in either of two situations.[66] First, the employer is vicariously liable when "the supervisor's harassment culminates in a tangible employment act, such as discharge, demotion, or undesirable reassignment."[67] The employer has no affirmative defense in available in that situation.[68] Second, an employer may be vicariously liable for a hostile work environment, even absent a tangible employment action. In that situation, however, the employer will not be liable if it proves by a preponderance of the evidence that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[69] "An employer can also be found directly liable for a supervisor's actionable harassment in certain instances, including when the supervisor engaged in the harassment with the purpose of serving the employer or when the supervisor's high rank makes him the employer's alter ego."[70]

---

[66]*Id*. at 1058-59 (citing *Penn. State Police v. Suders*, 542 U.S. 129, 143-46 (2004); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

[67]*Id*. at 1059 (quoting *Ellerth*, 524 U.S. at 765).

[68]*Id*.

[69]*Id*; *see Faragher*, 524 U.S. at 807.

[70]*Id*. at n.3 (citing *Harrison v. Eddy Potash, Inc.*, 158 F. 3d 1371, 1374-75 (10th Cir. 1998)).

*Alter Ego*

Plaintiff first argues that Judge Stewart was the "proxy" or alter ego of the defendant State of Kansas and, thus, defendant is directly liable for the sexual harassment. As defendant notes, plaintiff raises this argument for the first time in her response brief, and the issue was not included in the Pretrial Order.[71] Regardless, this argument is without merit. In support of her argument, plaintiff relies upon *Mallinson-Montague v. Pocrnick*,[72] where the Tenth Circuit applied the alter ego theory to a bank vice president. The court explained, "[a]s the Supreme Court recognized in *Burlington*, an alter ego instruction is appropriate in those situations 'where the agent's high rank in the company makes him or her the employer's alter ego.'"[73]

The Court declines to extend the alter ego theory of direct liability to Judge Stewart. In the cases applying this theory in a corporate context, the supervisor/agent's rank effectively put him in a position of ultimate authority, thus answering to no one.[74] Although Helm is correct that a district judge has great power, the Court disagrees that Judge Stewart essentially answered to no one. Judge Stewart was one of more than 200 district judges employed by the State of Kansas. The OJA implements the rules and policies of the Kansas Supreme Court as they apply to the operation and administration of the Judicial Branch.[75] The Kansas Commission on

---

[71](Doc. 48.) "The pretrial order is the controlling document for trial." *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (quoting *Expertise Inc., v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 1987)); Fed. R. Civ. P. 16(e). Under Rule 16(e) of the Federal Rules of Civil Procedure, a pretrial order "may be modified 'only to prevent manifest injustice.'" *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1208 (10th Cir. 2002) (quoting Fed. R. Civ. P. 16(e)).

[72]224 F.3d 1224, 1232-33 (10th Cir. 2000).

[73]*Id.* (quoting *Burlington*, 524 U.S. at 758).

[74]*Id.*

[75]*See* http://www.kscourts.org/court-administration

Judicial Qualifications is charged with assisting the Supreme Court with judicial disciplinary matters.[76] Judge Stewart is not the alter ego of the State of Kansas and it therefore, is not directly liable for the alleged harassment by Judge Stewart.

### Culmination in Termination

Helm also argues that defendant is not entitled to the *Faragher* defense because the sexual harassment culminated in her termination. The Supreme Court has held the defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."[77] The Court explained that, "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation."[78] Construing all facts in the light most favorable to the plaintiff, the Court finds Helm has not proffered any evidence indicating that the alleged harassment culminated in her termination. Helm does not argue that Judge Stewart's harassment resulted in the termination of her employment. Rather, Helm contends that she was terminated in retaliation for reporting Judge Stewart's alleged sexual harassment to Judge King and Judge Bednar.

The record establishes a distinct temporal break between the alleged harassment of Helm and the circumstances leading up to her discharge. Specifically, when Helm told Judge King in July 2007 that Judge Stewart made her uncomfortable, she told Judge King later that day that she had discussed the matter with Judge Stewart and did not wish to pursue it any further. Helm

---

[76]*See* http://www.kscourts.org/appellate-clerk/general/commission-on-judicial-qualifications

[77]*Ellerth*, 524 U.S. at 765.

[78]*Id.* at 761.

then went on FMLA leave. She raised the alleged harassment with Judge Bednar in August 2007, around the time she was supposed to return to work. Judge Bednar immediately reported Helm's allegations to Judge King and Crossland, who reported the matter to the OJA, which began its investigation of Judge Stewart. Helm remained on leave and was told by Steve Crossland that, upon her return, they would discuss altering her duties. Helm was not discharged until December 2007, three months after she reported the alleged harassment and after the investigation of Judge Stewart was underway. There is no evidence that Judge Stewart used his authority or played a role in the decision to terminate Helm.[79] Moreover, "significant, intervening circumstances serve[d] to break the causal connection between the alleged harassment . . . and the eventual termination of plaintiff,"[80] specifically, Helm's report of the harassment, Judge Bednar's report to OJA, and the investigation that followed. Construing all facts in favor of the plaintiff, the Court finds that Helm has not shown that the harassment she allegedly endured culminated in the termination of her employment.

The Court finds that, even if Helm was terminated in retaliation for reporting the alleged harassment, there is no basis for the Court to find that her termination was the culmination of the harassment by Judge Stewart. Thus, the Court cannot find that a "tangible employment action" as contemplated by *Faragher* and *Ellerth* occurred under the facts of this case. Consequently, the affirmative defense is available to defendant.

### Application of Affirmative Defense

---

[79] *Jones v. Rent-A-Center, Inc.*, 240 F. Supp. 2d 1167, 1179 (D. Kan. 2002) (citing *Johnson v. West*, 218 F.3d 725, 731 (7th Cir. 2000)).

[80] *Id.* (quoting *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 161-62 (D. Md. 2000)).

As previously noted, the affirmative defense recognized by *Faragher* and *Ellerth* "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[81] The Court discusses each element in turn.

First, the uncontroverted evidence shows that defendant exercised reasonable care to prevent and correct promptly Judge Stewart's alleged sexually harassing behavior. Defendant had in place an adequate sexual harassment policy that prohibits sexual harassment, identifies the complaint procedure, states that a confidential investigation will be conducted, and informs employees that those who report harassment will not be retaliated against.[82] The anti-harassment policy is included in the Kansas Judicial Branch Employee Handbook. Although Helm contends that the policy is "buried" in the middle of the handbook, it is undisputed that Helm signed an acknowledgment page indicating that she received and read the handbook, and that she kept a copy in her desk.

Although having an effective anti-harassment policy is not in itself dispositive, "distribution of a valid antiharassment policy provides compelling proof that [an employer] exercised reasonable care in preventing and promptly correcting sexual harassment."[83] An employer with an effective written policy is not automatically shielded from vicarious liability, and may be found liable based on a lack of reasonable care under this first element of the defense

---

[81]*Pinkerton v. Colo. Dept. of Transp.*, 563 F. 3d 1052, 1061-62 (10th Cir. 2009) (quotation omitted)).

[82]*Id*. at 1062.

[83]*Anderson v. Wintco* Inc., 314 F. App'x 135, 139 (10th Cir. 2009) (quoting *Weger v. City of Ladue*, 500 F.3d 710, 719 (8th Cir. 2007)).

if it fails to enforce its policy or fails to investigate and correct the harassment claim.[84]

Helm contends that defendant's policy was not effectively enforced because it did not provide adequate training about its policy to non-management employees, including Helm. As evidence, she points to the testimony of Larry Thibault, who she contends received no training and could not identify what would constitute a violation of the policy. In fact, Thibault testified that he did not believe the anti-harassment policy required him to report something he overheard Helm tell another co-worker about Judge Stewart. This evidence is not enough to create a genuine issue of material fact. Helm does not dispute that defendant failed to train other judicial employees or managers. The undisputed evidence shows that defendant adequately distributed its policy to Helm and made her aware of it.

Moreover, defendant's actions reflected reasonable care to promptly correct Judge Stewart's behavior. When Helm reported to Judge Bednar that she had been sexually harassed by Judge Stewart, he immediately reported it to Crossland and Judge King. Crossland reported the complaint to OJA, and it was investigated. Crossland made plans to alter Helm's work assignment when she returned to work so she would not have to work with Judge Stewart. Crossland assured Helm when he met with her in August 2007 that her job was not in jeopardy, her complaint would be investigated and her duties altered upon her return. Helm's complaint was in fact investigated by the Commission on Judicial Qualifications.

Helm argues, however, that defendant did not follow its own policy when she reported the sexual harassment to Judge King. At that time, Helm did not specify the basis for her

---

[84]*Id.* (citation omitted).

complaint, only that Judge Stewart made her feel uncomfortable. Later that day, she told Judge King that she had spoken with Judge Stewart, had resolved the problem, and did not wish to complain. Judge King's failure to take further action was not unreasonable under these circumstances. When Helm made specific allegations to Judge Bednar the next month, action was immediately taken on her complaint. Given defendant's prompt and effective action to Helm's complaint to Judge Bednar, the Court finds no genuine issue left for trial about the reasonableness of defendant's response.

Next, having found that defendant carried its burden with respect to the first element of the affirmative defense, the Court turns to the question of whether Helm unreasonably failed to avail herself of the preventive corrective opportunities afforded her. "Following *Ellerth* and *Faragher*, the plaintiff who alleges no tangible employment action has the duty to mitigate harm, but the defendant bears the burden to allege and prove that the plaintiff failed in that regard."[85] According to Helm, Judge Stewart's harassing behavior began in 1998, he began touching her inappropriately after her return from surgery in August 2006, and his behavior escalated in March and April 2007. Helm did not complain until she approached Judge King in June 2007, and even then, she did not specify the basis for her complaint. Helm did not make specific allegations until she complained to Judge Bednar in August 2007. Defendant contends this delay constitutes unreasonable failure to take advantage of the anti-harassment policy.

The only explanation for the delay given by Helm is that she was intimidated by Judge Stewart because he was a judge with substantial power within the State, as well as in the community. However, "a generalized fear of retaliation simply is not sufficient to explain a

---

[85]*Pinkerton*, 563 F.3d at 1063 (quoting *Suders*, 542 U.S. 129, 152 (2004)).

long delay in reporting sexual harassment."[86]  As the Tenth Circuit recently explained,

> Title VII in general, and the *Ellerth/Faragher* defense in particular, is premised on a cooperative framework wherein the employee reports sexual harassment and the employer remedies the improper conduct. "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." It is undeniable that raising problems regarding sexual harassment can be uncomfortable for the employee, but if we were to allow an employee's subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee's reporting requirement, we would "completely undermine Title VII's basis policy 'of encouraging forethought by employers *and* saving action by objecting employees.'"[87]

In this case, the alleged harassment against Helm is quite serious, involving extremely offensive and objectionable language and touching that began in 2006 and escalated in 2007. Despite Helm's claim that she "had no idea" that defendant had an anti-sexual harassment policy, she acknowledged that she had read the employee handbook and kept a copy in her desk. The Court finds no adequate excuse for her delay in reporting these far from minor incidents. Accordingly, the Court concludes that defendant has shown that Helm's delay in reporting the harassment was unreasonable.   Defendant's motion for summary judgment is granted with respect to plaintiff's sexual harassment claim.

## C.    Retaliation

In analyzing retaliation claims under Title VII, the court applies the three-part test

---

[86]*Id*. (two month delay) (collecting cases).

[87]*Id*.

established in *McDonnell Douglas Corp. v. Green*.[88]  "Pursuant to this test, [plaintiff] bears the initial burden of establishing a prima facie case of retaliation."[89]  "To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that [she] engaged in protected opposition to discrimination [under Title VII], (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[90]

If plaintiff meets her burden of establishing a prima facie case of retaliation, then defendant "must offer a legitimate, non-retaliatory reason for [its] employment action against [plaintiff]."[91]  Should defendant satisfy this burden, plaintiff then "bears the ultimate burden of demonstrating that [defendant's] proffered reason is pretextual."[92]  Plaintiff "may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons."[93]

### Prima Facie Case

Although defendant denies that any sexual harassment occurred, there is no serious

---

[88]*Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. 792 (1973)).

[89]*Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (quotation omitted).

[90]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (footnote omitted).

[91]*Vaughn*, 537 F.3d at 1150 (quotation omitted; first alteration in original).

[92]*Id.* (quotation omitted).

[93]*Id.* at 1153 (quotation omitted; alteration in original).

dispute that Helm has met the first two prongs by showing she engaged in protected opposition to the harassment and that she was terminated after she reported Judge Stewart's inappropriate behavior. Thus, the Court addresses whether plaintiff has met the third element, the requisite causal connection.

The Tenth Circuit has held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[94] However, "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."[95] In *Meiners*, the court held that a "six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."[96]

Helm was terminated approximately six months after relating Judge Stewart's unspecified inappropriate behavior to Judge King and approximately four months after reporting specific allegations to Judge Bednar. This temporal break is too great to establish causation by temporal proximity. As a result, Helm must provide additional evidence beyond mere temporal proximity to establish a causal connection.

As additional evidence, Helm offers that Judge King did not submit a report to Crossland or the OJA when Helm approached him about Judge Stewart in July 2007. As previously

---

[94]*Miller v. Auto Club of N.M., Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005) (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).

[95]*Id.* (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)).

[96]*Meiners*, 359 F.3d at 1231.

discussed, Helm did not give Judge King specifics about Judge Stewart's behavior that made her "uncomfortable," and told Judge King that she had spoken to Judge Stewart and resolved the matter and did not wish to make a complaint. Helm also contends that when Judge Bednar told Judge Stewart what Helm had reported, Judge Bednar remarked that Helm complained only to get money. Judge Bednar's comments were allegedly made in August 2007, approximately four months before Helm was terminated. Moreover, Judge Bednar immediately relayed Helm's complaint to Judge King and Crossland, which resulted in the OJA investigation of Judge Stewart. This evidence does not prove a causal connection between plaintiff's protected action and her termination. Because plaintiff has failed to provide evidence of a causal connection, summary judgment is appropriate on plaintiff's retaliation claim.

### Pretext

Although Helm has not established a prima facie case of retaliation, the Court will nevertheless briefly address the remaining *McDonnell Douglas* analysis. Defendant contends that it terminated Helm because of her admitted felony criminal conduct, which resulted in her inability to access KCJIS information, rendering her unable to carry out her duties as a judicial administrative assistant. Because defendant has articulated a legitimate, nondiscriminatory reason for its actions, the burden would then shift to Helm to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual or "unworthy of belief."[97]

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

---

[97]*See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006).

for its action that a reasonable factfinder could rationally find them unworthy of credence."[98] While this burden is not onerous . . . it is also not empty or perfunctory."[99]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[100]  "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment."[101]

As evidence of pretext, Helm contends that former court administrator Ron Chance had previously entered into a diversion agreement for driving under the influence of alcohol ("DUI") and was not terminated.  Plaintiff may demonstrate pretext by providing evidence that she was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.[102]  An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the "same standards governing performance evaluation and discipline."[103]  "A court should also compare the relevant employment

---

[98]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[99]*Id*. at 1323-24.

[100]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[101]*Myers v. Colgate-Palmolive Co.*, 102 F. Supp. 2d 1208, 1217 (D. Kan. 2000) (citing *Hilti, Inc.*, 108 F. 3d at 1323).

[102]*Kendrick*, 220 F.3d at 1232.

[103]*Id*. (quoting *Aramburu,* 112 F.3d at 1404 (internal quotations and citation omitted)).

circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."[104] Differences in treatment that are explained by a nondiscriminatory motive will not sustain a claim of pretext.[105]

The Court assumes that Chance had the same duties as court administrator as Crossland, who described his responsibilities as including supervision of the district court clerk's office and the court services office, preparation of the annual budget, and keeping records time sheets and employee evaluations. The record does not contain the details or circumstances of Chance's DUI or diversion agreement, nor is there anything in the record to indicate that Chance's DUI diversion affected or prevented him from performing his job as court administrator. By contrast, Helm's felony criminal charges involved in the diversion agreement involved a crime of violence, and precluded her from performing her duties as an judicial administrative assistant, specifically handling certain criminal records, documents and proceedings.

Helm also claims that discriminatory intent may be inferred because defendant "allowed" her to remain on leave until it had an "excuse" to terminate her employment. She also asserts that she "was told not to come back to work immediately upon complaining." These statements are not supported by the record. Instead, it is undisputed that Helm requested FMLA leave during July 2007. When that leave was exhausted, she applied for and received shared leave. There is no evidence in the record that Helm wanted to return to work but was prevented from doing so. Instead, the record indicates that when Helm and her husband came to Crossland with

---

[104]*Id.*

[105]*Id.* (citing *Flasher*, 986 F.2d at 1320).

concerns about her paycheck, Crossland suggested she could apply for shared leave, assured her that her job was not in jeopardy and stated that they were willing to reassign her to a position away from Judge Stewart.

To show pretext, Helm must provide specific facts that prove defendant's reasons for termination were pretextual. Because Helm has failed to produce any evidence of pretext beyond her own speculation, defendant is entitled to summary judgment as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 46) is GRANTED; plaintiff's Motion for Partial Summary Judgment (Doc. 19) is DENIED.

IT IS SO ORDERED.


Dated: <u>March 17, 2010</u>

                                       S/ Julie A. Robinson              
                                         JULIE A. ROBINSON
                                         UNITED STATES DISTRICT JUDGE